**PIEDMONT AIRLINES, INC.**

v.

**AIR LINE PILOTS ASSOCIATION.**

No. 94–1643.

United States District Court,
E.D. Pennsylvania.

Aug. 5, 1994.

214

Barry Simon, Schnader, Harrison, Segal & Lewis, Philadelphia, PA, Michael J. Minerva, Jr., Ford and Harrison, Atlanta, GA, for plaintiff.

Alaine S. Williams, Willig, Williams & Davidson, Philadelphia, PA, Clay Warner, Airline Pilots Ass'n, Washington, DC, for defendant.

## MEMORANDUM AND FINAL JUDGMENT

HUTTON, District Judge.

Presently before the Court are defendant's Motion to Dismiss, plaintiff's response and defendant's reply.

### I. BACKGROUND

In August, 1992, Piedmont Airlines, Inc. ("Piedmont") and the Air Line Pilots Association ("ALPA") began negotiations for a successor collective bargaining agreement. In April, 1993, the parties invoked the mediatory services of the National Mediation Board ("NMB"). During the summer of 1993, the ALPA and the ALPA's governing unit for Piedmont pilots, the Piedmont Master Executive Council ("MEC"), became dissatisfied with Piedmont's position on several key issues. In an effort to coerce Piedmont into changing its bargaining position, the defendants devised the "no waivers, no favors" program.

Under this program, the defendants envisioned that Piedmont pilots would refuse to volunteer for "open flights", i.e., flights where no specific flight crew was originally assigned. They believed that this would result in a decrease in the number of Piedmont flights which, in turn, would result in a concomitant loss of profits for the airline. On August 9, 1993, Bob H. Pantazis, the Chairman of MEC, penned a letter to all Piedmont pilots announcing the "no waivers, no favors" program. According to Piedmont's complaint, the program had its intended result: it forced Piedmont to cancel dozens of flights, which resulted in a substantial loss of profits for the company.

On March 10, 1994, Piedmont filed a complaint, claiming that the ALPA violated the status quo provisions of the Railway Labor Act ("RLA"), 45 U.S.C. § 156, and its duty to bargain in good faith. The complaint seeks the following relief: (1) an injunction prohibiting the ALPA from disrupting Piedmont's normal airline operations; (2) a declaration that the ALPA's concerted refusal to fly violated § 152, First and § 156; and (3) compensatory damages.

On March 28, 1994, the parties reached an agreement on a new contract. This agreement is not final, however, since it is still subject to ratification by the ALPA. On April 1, 1994, the ALPA informed its pilots that the "no waivers, no favors" program was over, and in its brief it maintains that "[it] has no plan[s] to resume the campaign."

In the instant motion, the defendant moves to dismiss the complaint in its entirety. It claims that the plaintiff's claims for declaratory and injunctive relief must be dismissed as moot since the parties have reached a new agreement, and it claims that the plaintiff's claim for monetary damages must be dismissed since the Railway Labor Act does not create a right of action for damages.

### II. DISCUSSION

#### A. Standard

Federal Rule of Civil Procedure 8(a) requires that a plaintiff's complaint set forth "a short and plain statement of the claim showing that the pleader is entitled to relief...." Fed.R.Civ.P. 8(a). Defendant has moved to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). When considering a motion to dismiss, this Court shall take all allegations contained in the complaint as true and construe them in the light most favorable to the plaintiff. *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 249–50, 109 S.Ct. 2893, 2906, 106 L.Ed.2d 195 (1989). The complaint shall only be dismissed if " 'it is clear that no relief could be granted under any set of facts that could be proved consistent with the allega-

tions.'" *Id.* (quoting *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984)); *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957).

## B. *The Railway Labor Act*

The RLA, which governs collective bargaining relationships in the railroad and airline industries, was crafted to avoid interruptions to commerce in those vital industries. It requires management and labor "to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes ... in order to avoid any interruption to commerce." 45 U.S.C. § 152, First. To further this purpose, the Act provides for two separate dispute resolution procedures: one for disputes arising out of the formation of collective bargaining agreements (major disputes), and one for disputes arising out of the interruption of those agreements (minor disputes).

Major disputes are those involving: the formation of collective bargaining agreements or efforts to secure them. They arise when there is no such agreement or where it is sought to change the terms of one, and therefore the issue is not whether an existing agreement controls the controversy. They look to the acquisition of rights for the future, not the assertion of rights claimed to have vested in the past.

*Elgin, Joliet & Eastern R.R. v. Burley,* 325 U.S. 711, 723, 65 S.Ct. 1282, 1290, 89 L.Ed. 1886 (1945) (*quoted in Consolidated Rail v. Railway Labor Executives Ass'n,* 491 U.S. 299, 302, 109 S.Ct. 2477, 2480, 105 L.Ed.2d 250 (1989).

Minor disputes, on the other hand, are those arising "out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules or working conditions." 45 U.S.C. § 152, Sixth. These types of disputes:

contemplate[ ] the existence of a collective agreement already concluded or, at any rate, a situation in which no effort is being made to bring about a formal change in terms or to create a new one. The dispute relates either to the meaning or proper application of a particular provision with reference to a specific situation or to an omitted case. In the latter event, the claim is founded upon some incident of the employment relation, or asserted one, independent of those covered by the collective agreement, e.g., claims on account of personal injuries. In either case, the claim is to rights accrued, not merely to have ones created in the future.

*Burley,* 325 U.S. at 723, 65 S.Ct. at 1290 (*quoted in Conrail,* 491 U.S. at 303, 109 S.Ct. at 2480–81).

Minor disputes must first be addressed to the normal grievance procedure and, failing that, to either the National Railroad Adjustment Board (NRAB), if the carrier is a rail carrier, or to a local System Board of Adjustment. 45 U.S.C. §§ 153; 184.

In the event of a major dispute, § 6 of the RLA, 45 U.S.C. § 156, requires labor and management to undergo a lengthy, multi-step process of negotiation and mediation under the auspices of the National Mediation Board. *Conrail,* 491 U.S. at 302, 109 S.Ct. at 2480. Until 30 days after that process has been completed, the parties are statutorily required to maintain the *status quo. Brotherhood of R.R. Trainmen v. Jacksonville Terminal,* 394 U.S. 369, 378, 89 S.Ct. 1109, 1115, 22 L.Ed.2d 344 (1969). During this time, "an employer cannot alter rates of pay, rules, or working conditions ... [a]nd the employees are under a parallel duty not to strike." *Empressa Ecuatoriana de Aviacion, S.A. v. District Lodge No. 100, Int'l Ass'n of Machinists,* 463 U.S. 1250, 104 S.Ct. 40, 77 L.Ed.2d 1457 (1983). Either party may be enjoined from engaging in any kind of self-help, such as a union strike or a carrier lockout, during the pendency of a major dispute. *See Conrail,* 491 U.S. at 302, 109 S.Ct. at 2480.

## C. *Claim for Monetary Damages*

The first question raised in this motion is whether Piedmont may maintain its claim for monetary relief. This question turns on whether the RLA allows an employ-

er to recover the monetary damages it sustains as a result of an illegal work stoppage.

Only one case has considered the question of whether an employer may recover monetary damages under the RLA, and it resulted in a divided court. In *CSX Trans., Inc. v. Marquar*, 980 F.2d 359 (6th Cir.1992), railroad employees complained about the lunch arrangements provided by their employer. Contending that this constituted a "major dispute", the union instituted a nine-state strike. That same day, the railroad obtained a temporary restraining order enjoining the strike. The dispute was ultimately resolved through the arbitration process. Nevertheless, the railroad sued the union for the damages it sustained in consequence of the strike. The district court dismissed the claim on the grounds that no court had ever allowed damages in that situation before, and the railroad appealed.

The Sixth Circuit noted that in passing the RLA, "Congress deliberately did not include in the RLA's provisions any enforcement mechanisms or remedies, intending instead that the courts would develop the law as to its enforcement with all available remedies." *Id.* at 365. Both the majority and the dissent recognized that, based on the RLA's legislative history, there may be instances where monetary damages may be recoverable under the Act. They differed, however, on the question of whether such damages were "appropriate" for illegal strikes over minor disputes. The dissent believed that there may be times where the damages sustained by an employer in a strike over a minor dispute may be recoverable.

The majority, on the other hand, did not believe that monetary damages are "appropriate" relief for illegal strikes involving minor disputes. It based this conclusion on the fact that "[i]n the 66–year history of the RLA, no federal court has published an opinion holding that a union may recover damages from a railroad or that a railroad may recover damages from a union." *Id.* Moreover, the majority believed that "[d]amages awards between railroads and unions are inappropriate because they threaten the delicate balance intended by the RLA." *Id.* In particular, the majority believed that the specter of liability for large damage awards could discourage unions from utilizing the strike mechanism, clearly their most potent bargaining tool. Therefore, the majority enacted a bright line rule barring actions for monetary damages over minor disputes.

Turning to the instant case, this Court likewise believes that monetary damages are not an appropriate remedy for disputes between the employers and unions. As the *Marquar* court recognized, no federal court has ever allowed an employer to maintain an action against a union for monetary relief. *See CSX Transp. Inc. v. Marquar*, 980 F.2d 359, 379–82 (6th Cir.1992); *Burlington Northern R.R. v. Bd. of Maintenance Way Employees*, 961 F.2d 86, 88–89 (5th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1028, 122 L.Ed.2d 173 (1993); *Louisville & Nashville R.R. v. Brown*, 252 F.2d 149, 155 (5th Cir.), *cert. denied*, 356 U.S. 949, 78 S.Ct. 913, 2 L.Ed.2d 843 (1958); *National Airlines, Inc. v. Air Line Pilots Ass'n*, 431 F.Supp. 53, 54 (S.D.Fla.1976). The Court cannot ignore the fact that although Congress has amended the Act numerous times, it has never promulgated a statute allowing an employer to sue a union for damages. Surely, if Congress disapproved of a rule of law which has persisted for decades, it would have acted by now.

### D. *Claims for Equitable Relief*

■ Next, the defendant moves to dismiss the plaintiff's claims for equitable relief. In its complaint, the plaintiff seeks an injunction prohibiting the ALPA from disrupting Piedmont's normal airline operations, and a declaration that the ALPA's concerted refusal to fly violated § 152, First and § 156. Since the complaint's filing, however, the parties have agreed to a new contract and the union has called off the "no waivers, no favors" program. Therefore, Piedmont's claims for equitable relief are moot.